UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| CHERYL L. ZEH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:04CV077 ERW |
| | ) | (TIA) |
| JO ANNE B. BARNHART, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This cause is on appeal from an adverse ruling of the Social Security Administration. All

pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28

U.S.C. § 636(b) for appropriate disposition.

## I.    Procedural History

On February 6, 2003, claimant Cheryl Zeh filed an application for Disability Insurance

Benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq. (Tr.46-48).[1] In

her application for benefits, claimant stated that her disability began on September 1, 1999, due to

the combination of her impairments including high blood pressure, hypothyroidism, surgery on left

hand, surgery on right elbow, injuries to right leg and left ankle, and osteoarthritis. (Tr. 54). On

initial consideration, the Social Security Administration denied claimant's claims for benefits. (Tr.

21-24). Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 75, 77-

79). On March 30, 2004, a hearing was held before an ALJ. (Tr. 229-66). Claimant testified and

---

[1]"Tr." refers to the page of the administrative record filed by the defendant with its Answer
(Docket No. 7/filed January 5, 2005).

was represented by counsel.  (Id.).  A vocational expert also testified at the hearing.  (Tr. 250-61, 263-65).  Thereafter, on June 18, 2004, the ALJ issued a decision denying claimant's claims for benefits.  (Tr. 8-19).  On August 27, 2004, the Appeals Council found no basis for changing the ALJ's decision and denied claimant's request for review of the ALJ's decision.  (Tr. 4-6).  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.    Evidence Before the ALJ

### A.  Hearing on March 30, 2004

#### 1.  Claimant's Testimony

At the hearing on March 30, 2004, claimant testified in response to questions posed by the ALJ and counsel.  (Tr.232-50).  At the time of the hearing, claimant was fifty-two years of age.  (Tr. 232).  Claimant completed high school and is a licensed practical nurse.  (Tr. 232).  Claimant testified that she received her nursing diploma in 1988.  (Tr. 232-33).  Claimant is right-handed.  (Tr. 239).  Claimant's husband works as a professional truck driver.  (Tr. 240).

On her application, claimant listed September, 1999, as the time she became disabled because she could barely complete her shift as a licensed nurse at Levering Healthcare due to the severe pain in her legs.  (Tr. 243).  At that time, claimant determined that she could no longer work.  (Tr. 243).  In her position as a charge nurse, claimant testified that cumulatively in an eight-hour work day she would sit for three to four hours and stand for two hours.  (Tr. 244).

Claimant testified that she worked as a charge nurse at various nursing homes, Blessing Hospital, Quincy Medical Group, and St. Mary's Hospital for the last fifteen years.  (Tr. 233).  Claimant's job duties as a nurse included passing out medicines, giving treatments and baths, and providing total care for the patients.  In her capacity as a charge nurse, claimant was in charge of

five certified nursing assistants and responsible for the care of fifty patients and her duties included distributing medications, providing treatments, contacting family members, and handling admissions. (Tr. 234). If the nursing assistants needed assistance with direct nursing care, claimant would provide assistance. (Tr. 234). Claimant worked in an urologist's office for over a year in the early 1990s. (Tr. 233). Prior to attending nursing school, claimant worked as a head cook at a nursing home. In 1997, she helped take care of her mother who had Alzheimer's and her father-in-law before his death. (Tr. 233, 249). Since 1995 claimant has not worked a full year because of the pain she experiences after standing for long periods. (Tr. 248-49). Claimant worked at Levering Healthcare and quit in September, 2000, due to leg pain preventing her from completing a normal shift. (Tr. 235-36). Claimant worked full time for four months in that position. (Tr. 248). Claimant testified that her position with Levering Healthcare was the last position she held with any regularity for more than a month. (Tr. 235-36). Claimant last worked as a medical assistant at the Medicine Shop for four days in December, 2002. (Tr. 234). Claimant's job duties included preparing medicine for prescriptions and working on the computer. (Tr. 235). Claimant testified that she left the position because of the severe pain in her legs exasperated by standing for four hours. (Tr. 235). Claimant testified that she voluntarily left the jobs because of her pain. (Tr. 249).

Claimant testified that Dr. Cramp has provided medical treatment for arthritis, blood pressure, thyroid problems, and general medical problems for the last eighteen months. (Tr. 234). In the late 1980s, claimant had surgery on her elbow for tennis elbow release. (Tr. 243). In March,1995, claimant had surgery on her left hand after breaking and dislocating her ring finger and injuring her small and index fingers in a work-related accident at Blessing Hospital. (Tr.

239). Claimant received physical therapy treatment at Quincy Medical Group after the surgery. (Tr. 239). In May, 1997, claimant tore a muscle in her right calf while bowling and received medical treatment at Blessing Hospital in Quincy, Illinois. (Tr. 237). Claimant fractured her left ankle in 1998/1999 while building a fence with her husband. (Tr. 236). The next summer, claimant fractured her other ankle after falling off her daughter's porch. (Tr. 237).

Claimant described experiencing severe pain, a burning aching pain, in her shoulders, elbow, and hand caused by strenuous activities such as scrubbing. (Tr. 240). Claimant testified that she seeks medical treatment including a shot when she experiences the severe pain. Claimant testified that Dr. Cramp has administered several injections during his course of treatment with the last shot being given in her hip area three to four months earlier. (Tr. 240-41). Claimant testified that Dr. Cramp prescribed pain medication and recommended rest and soaking in a hot bath and using hot pads as treatment for her pain. (Tr. 242). Claimant listed Bextra for arthritis, Darvocet and Lortab for pain, Atenolol for blood pressure, Levoxyl for thyroid, and a hormone as her regular medications. (Tr. 242-43). Claimant testified the Bextra prescription is the only current treatment for her arthritis and that is why she scheduled an appointment to see a rheumatologist so that she would not have to take pain medicine all of the time. (Tr. 247).

As to her daily activities, claimant testified that she fixes something to eat, takes a shower and rests. (Tr. 237). Claimant testified that she does some light housekeeping and then rests. During the day, claimant props her legs with great frequency. (Tr. 237). To alleviate the pain in her legs, claimant testified that she takes a hot bath. (Tr. 237-38). Claimant testified that she takes care of her needs and rests as needed during the day. (Tr. 238). Claimant's activities have been limited since she quit working at Medicine Shop in December, 2002. Claimant testified that

- 4 -

her activities are limited by the burning, aching pain she experiences in her legs, arms, shoulders, and knee joints. Sometimes the pain is so severe, claimant takes pain medicine and lies down. Claimant testified that she drives five to six miles maybe once every two weeks but no more, because pressing on the steering pedal causes her legs to ache, and she has problems clasping the wheel for long periods of time. (Tr. 238). Claimant testified that she can do light housekeeping, but she cannot stir while cooking or do any strenuous scrubbing or cleaning. (Tr. 239). Claimant's daughter, who lives next door, and husband assist her with bathroom cleaning. (Tr. 239-40). Claimant's leg and hand pain preclude her from gardening or mowing the lawn. (Tr. 240). Claimant testified that she has to rest a lot during the day, because she can stand for two hours and sit for three to four hours. (Tr. 246). Claimant explained she rests during the day to alleviate the burning, aching pain in her legs, because she has problems sleeping at night. (Tr. 247). Claimant canceled her scheduled appointment with a rheumatologist after her major surgeries in January. (Tr. 247).

Claimant testified that she can sit with both feet on the ground for about an hour, but if she sits longer, she experiences pain in her hip and has to get up and move around. (Tr. 241). Claimant testified that she can lift ten pounds at one time and can stand for one hour before experiencing a pain in her legs. (Tr. 241-42). Claimant testified that during the day she can stand for a couple of hours and walk a city block and a half before experiencing pain in her ankles. (Tr. 242). The ALJ questioned claimant's counsel regarding the mental source statement prepared by Dr. Cramp, because based on claimant's degenerative condition, osteoarthritis in her lumbar spine, hips, knees, and ankles, Dr. Cramp limits claimant's lifting and reaching and handling without specifying particular weight limits or explaining why such limitations would be necessary.

(Tr. 244-45). The ALJ also noted that claimant's file did not contain any documents showing specific treatment for any upper extremity condition. (Tr. 245). Counsel stated he was only aware of claimant's old tennis elbow release, but he was unaware if Dr. Cramp has provided any specific treatment for such upper extremity condition. The ALJ further noted that most of claimant's treatment records relate to claimant's lower extremity conditions with some older records relating to lower and upper extremity conditions. (Tr. 245). The ALJ noted that the record is devoid of any specific treatment records since 1999 for epicondylitis, and claimant's counsel agreed. (Tr. 245-46). The ALJ opined that the record indicates that there were many years of work activity following claimant's upper extremity injuries, but no recent treatment documented. (Tr. 246). The ALJ opined that he did not see any basis for any of the reaching and handling limitations set forth in Dr. Cramp's RFC inasmuch as Dr. Cramp never completed an assessment of claimant's upper extremities. (Tr. 246).

Based on the treatment record, the ALJ noted his concern regarding whether there is any basis for the upper extremity limitations imposed by Dr. Cramp. (Tr. 260). The ALJ opined that he did not impose any upper extremity limitations inasmuch as he did not find any upper extremity limitations based on claimant's treatment records. (Tr. 260-61). The ALJ further noted that not only did Dr. Cramp impose upper extremity limitations, he was not specific about the limitations imposed. (Tr. 261). Claimant indicated that since the time she completed the physical therapy course of treatment in 1996, she has not received any ongoing treatment for either of her upper extremities, her hand or arm. (Tr. 263).

### 2. Testimony of Vocational Expert

Vocational Expert Gary Weimholt, M.S., CDMS,[2] classified claimant's past relevant work as a licensed practical nurse in terms of <u>Dictionary of Occupational Titles</u> at a second level of skill with the medium physical demand level. (Tr. 252). Mr. Weimholt testified that claimant also worked as an office nurse requiring light physical demand and as a pharmacy technician/clerk requiring light physical demand and ranked as a semi-skilled job. (Tr. 253-54).

The ALJ asked Mr. Weimholt to assume that

someone of the claimant's age, education and experience, and we assume further, the capacity for exertionally light work if permitted to alternate sitting with standing on an hourly basis as needed and no forceful pushing or pulling with the lower extremities, either lower extremity, would claimant's past work be able to be performed? LPN would be ruled out on exertional alone, it looks like.

(Tr. 255). Mr. Weimholt agreed that based on the hypothetical, the jobs of LPN would be ruled out as well as office nurse and pharmacy clerk because of the need to alternate sitting and standing. (Tr. 255). Next, the ALJ asked if "[f]or a younger individual under age 50, are there other jobs that can be performed?" (Tr. 255). As examples, Mr. Weimholt cited some cashiering jobs in the light range allowing for alternate sitting and standing and noted approximately 2,500 such jobs exist in the Missouri labor market and approximately fifty times that number exist in the national labor market. (Tr. 256). Mr. Weimholt cited information clerk as another job satisfying the hypothetical question and noted approximately 1,200 such jobs exist in the local economy and 60,000 nationally. (Tr. 257). Mr. Weimholt also cited the positions of assembler of small parts with 2,500 jobs locally and 125,000 nationally and other assorted electronic workers with 1,500 jobs locally and 75,000 nationally.

Next, the ALJ asked Mr. Weimholt to assume that

---

[2]"CDMS." is the abbreviation for a certified disability management specialist. (Tr. 34).

> ... someone 50 and over – well, actually, with exertionally light work,
> transferability is not material at age 50, either, but my next hypothetical is going to
> be more sedentary, so let me ask the question. Taking into account both sedentary
> and light jobs for an individual 50 and over with these – ... What skills does
> claimant have and would any transfer to light or sedentary jobs within the RFC that
> I gave you?

(Tr. 257). Mr. Weimholt noted that claimant does have skills in the area of medical services,

medical treatment, and attending to patients, and all of these skills require an understanding of

medical conditions, nursing procedures, and administration of treatments. (Tr. 258). Mr.

Weimholt noted that such individual would have record-keeping skills of a detailed nature. In

response to the ALJ's question regarding transferability of skills to other jobs fitting the RFC

previously set forth allowing for alternate sitting and standing at the light to sedentary level, Mr.

Weimholt opined that such an individual could work as an admissions clerk in a medical services

center, either a hospital or an outpatient clinic, with 1,000 jobs available at the local level and

approximately 50,000 jobs available at the national level. (Tr. 258, 265). At the light level, Mr.

Weimholt opined that such an individual could work as a case aide under social services,

particularly working with geriatric cases or persons receiving mental health services, with

approximately 900 jobs at the local level and fifty times that number in the national economy. (Tr.

259). With respect to the position of a case aide under social services, Mr. Weimholt noted that

claimant's ability to work the position may require a little bit of adjustment inasmuch as the

position is outside the medical setting where claimant has worked. (Tr.259).

     Mr. Weimholt agreed with claimant's counsel that a treating physician is an appropriate

place to obtain information when placing an individual on a job. (Tr. 260). Mr. Weimholt

testified that an individual who needs to lie down during the day could not work any of the jobs

he cited in response to the ALJ's hypotheticals. The ALJ indicated that he would stipulate to the fact that if an individual has to lie down other than on regular breaks, such individual is not capable of sustaining regular employment. (Tr. 260).

In a follow-up hypothetical question, the ALJ asked Mr. Weimholt to assume that

> ... you gave me the two jobs, admissions clerk, and case aide in terms of transferable skills – if the individual is limited to lifting and carrying 10 pounds frequently, 20 pounds occasionally, but was limited mainly to sitting six hours during eight-hour-day and standing and walking a maximum of two hours, standing and walking a maximum of two in an eight-hour-day, again permitting alternating sitting and standing as needed for comfort, and again no forceful pushing or pulling in the lower extremities – so the main change there is primarily sitting with a maximum on standing and walking – could either of those jobs be performed? I think you indicated the case aide might permit more sitting?

(Tr. 263-64). Mr. Weimholt responded in the affirmative and explained the admissions clerk job could be performed seated inasmuch as it was sedentary while the case aide job would be borderline. (Tr. 264). In response to the ALJ's follow-up question adding the limitation of no forceful pushing or pulling with either of the upper extremities, Mr. Weimholt responded such additional information did not change his opinion inasmuch as the job of admissions clerk would not require any forceful pushing or pulling. (Tr. 264-65).

### 3. Forms Completed by Claimant

In the Disability Report, claimant indicated that her conditions limit her ability to work, because she cannot stand or walk for long periods of time due to the severe pain. (Tr. 54). Claimant opined that her conditions forced her to quit working, because she could not function after a few hours due to the severe pain in her legs and arms. (Tr. 55).

In the Pain Questionnaire dated February 28, 2003, claimant reported experiencing pain every waking moment and problems sleeping more than four hours at night. (Tr. 64). When

experiencing severe pain, claimant takes Lortab which helps take off the edge and sleep at night. (Tr. 64).

### III.    Medical Records

On October 1, 1986, Dr. Andre Edmonds evaluated claimant for right arm pain.  (Tr. 214).  Claimant reported pain on the lateral aspect of her elbow over the lateral epicondyle and extensive muscle mass, and tingling in all of her fingers.  (Tr. 214).  On October 27, 1986, claimant was admitted to Blessing Hospital for treatment of right tennis elbow.  (Tr. 212, 214). Dr. Edmonds performed a right tennis elbow release with epicondylectomy on October 28, 1986. (Tr. 213, 215).

On June 3, 1990, claimant received medical treatment in the emergency room at Blessing Hospital.  (Tr. 210).  In the Impression section, the attending physician noted concern about claimant's weight loss and eating habits and discussed self-induced vomiting/binging and laxative abuse with claimant.  (Tr. 210).

On August 30, 1992, claimant sought treatment in the emergency room at Blessing Hospital for cervical strain caused by a fall the night before.  (Tr. 206).

On November 12, 1992, Dr. David Drennan excised a lesion from claimant's right breast. (Tr. 202).  Dr. Drennan listed fibroadenoma, right breast as his preoperative and postoperative diagnosis.  (Tr. 202).

On August 28, 1993, Dr. John Bozdech performed an EGD on claimant to survey the upper gastrointestinal tract to determine the cause of her abdominal pain.  (Tr. 197).  Dr. Bozdech indicated normal results and continued claimant's Prilosec prescription. (Tr. 197).

On January 14, 1993, Dr. Harry Ruth performed an endoscopic left anterior

ethmoidectomy with functional nasal antral window and endoscopic left maxillary antrostomy. (Tr. 203). Dr. Ruth listed chronic sinusitis as his preoperative and postoperative diagnosis. (Tr. 203-05). Later that day, Dr. Hayden treated claimant at Blessing Hospital for postoperative swelling. (Tr. 196).

On March 25, 1994, the emergency room doctor at Blessing Hospital treated claimant for sinusitis and pharyngitis. (Tr. 195).

On May 28, 1994, claimant sought treatment for pain in the posterior right lower leg. (Tr. 194). Later that day, claimant reported right calf pain and tenderness to the emergency room doctor at Blessing Hospital. (Tr. 193). The doctor diagnosed claimant with musculoskeletal in etiology. (Tr. 193).

On November 10, 1994, claimant sought emergency room treatment at Blessing Hospital for a headache, a questionable migraine, and a history of maxillary sinusitis. (Tr. 192).

On March 13, 1995, claimant injured her fourth finger and received treatment in the emergency room at Blessing Hospital for left fourth finger proximal interphalangeal joint subluxation. (Tr. 191).

In the Initial Evaluation on March 30, 1995, Judy Savko, a physical therapist at Tri-State Rehabilitation Services, noted that claimant appeared for treatment following an injury on March 13, 1995. (Tr. 75-76). Claimant dislocated her left fourth digit when attempting to catch a falling IV pump. Ms. Savko noted that claimant's active range of motion was limited by her pain and opined that claimant should benefit from physical therapy. (Tr. 75-76). Examination revealed severe limitation in movement through the fourth digit on left hand. (Tr. 75). As goals, Ms. Savko determined through therapy she could increase claimant's range of motion to at least 50%

within the normal limits and eliminate edema. (Tr. 77). On April 6, 1995, claimant returned for follow-up treatment and reported no change with treatment. (Tr. 73). Ms. Savko recommended that claimant continue the stretching exercises. (Tr. 73). In the Progress Note, Ms. Savko claimant called and reported that Dr. Holt discontinued the physical therapy treatment, because he showed her three different stretching exercises to do at home. (Tr. 74). In the Discharge Summary of April 14, 1995, Ms. Savko noted that claimant attended four appointments for treatment to decrease pain and stiffness, to increase range of motion, and to eliminate edema so that claimant could return to work. (Tr. 72). Ms. Savko opined that none of the rehab goals were achieved, because claimant's physician terminated the physical therapy referral and requested closure. (Tr. 72).

On October 17, 1995, Dr. Richard Coin, a reconstructive microsurgeon examined claimant on referral by Illinois Risk Management Services Center for Health Affairs. (Tr. 128-32). Prior to the evaluation, Dr. Coin reviewed claimant's medical records pertinent to her hand injury and treatment to date. (Tr. 128). Claimant reported being injured when performing her nursing duties by an intravenous pole holding two continuous infusion pumps striking her left hand. The significant contact of the pumps caused a dislocation of her left ring finger and a hyperextension injury to her left middle and left small fingers. Claimant reported resigning from her position on July 16, 1995. (Tr. 128). Dr. Stoops treated claimant in the emergency room at Blessing Hospital, and noted that the x-rays taken at that time revealed a post reduction film of a dorsal subluxation of the proximal interphalangeal joint of the left ring finger with good position alignment and no acute fracture. (Tr. 129). Subsequent x-rays revealed that the joint in her left hand remained stable, but a chip fracture on the volar aspect of the proximal end of the middle

phalanx was slightly displaced. Claimant was referred to Dr. Andre Edmonds of the Quincy Physician and Surgeon's Clinic who recommended buddy taping and early range of motion as treatment for her PIP joint dislocation. On March 16, 1995, claimant had some swelling over the dorsal interphalangeal joint with tightness. In the follow-up visit, claimant had no swelling but some dysesthesia subjectively in the left small ring finger and the long finger. An x-ray revealed the joint to be reduced, and Dr. Edmonds referred claimant to Dr. William Holt for a second opinion. After evaluating claimant on April 5, 1995, Dr. Holt opined that claimant's numbness did not appear to have an organic basis, and there appeared to be some functional basis of claimant's complaints. In a follow-up visit, Dr. Edmonds explained to claimant that it would take six months for her symptoms to settle down and indicated no restrictions for claimant. (Tr. 129).

In the evaluation on October 17, 1995, claimant reported continued numbness, aching, and swelling of the left middle, ring, and small fingers and an inability to bend those same fingers in a normal way. (Tr. 127, 130). Dr. Coin's examination of claimant's left upper extremity revealed a subtle amount of edema in the left small and ring fingers and a lack of range of motion of approximately 30% of flexion at the proximal interphalangeal joint actively and 40% at the distal interphalangeal joint of the left ring finger. Dr. Coin noted that claimant appears to have normal passive range of motion even though she subjectively indicated that she could not bend the small and middle fingers completely. Dr. Coin further noted that claimant has normal abduction of the digits and has good collateral ligament stability. Dr. Coin found claimant to have tightness and passive motion in the left ring finger. (Tr. 130). Based on his examination, Dr. Coin concluded that claimant has had a dislocation of the proximal interphalangeal joint of the left ring finger with some low grade to moderate scar contracture over the proximal interphalangeal joint due to a

contusive injury. (Tr. 131). Dr. Coin recommended a tenolysis procedure to lyse some of the scarring that has occurred secondary to the dislocation around the joint capsule and tendon mechanisms of the finger. Dr. Coin opined that such a procedure may or may not offer claimant some improvement. Dr. Coin noted that claimant currently maintained "a 2% permanent partial disability at the level at the left hand" and that claimant could continue to work as a registered nurse if she so chose. (Tr. 131).

On July 9, 1996, claimant contacted Dr. Coin's office and indicated her interest in pursuing tenolysis, capsulotomy, and neuroloysis surgery. (Tr. 127). Claimant received approval for the procedure by her insurance company. Dr. Coin scheduled the outpatient surgery at St. John's Mercy Medical Center on July 15, 1996. (Tr. 127, 166). In a surgery consultation on July 15, 1996, Dr. Coin explained the post-operative course, expectations, risks, complications, and the alternatives to surgery. (Tr. 127, 167-68). Claimant indicated that she fully understood and wished to proceed even though there was no guarantee the procedure would improve the condition. (Tr. 126-27). Claimant underwent tenolysis, capsulotomies, neuroloysis, and z-plasty to her left hand, left ring finger, and left middle and left small fingers on July 15, 1996. (Tr. 126, 167-68). Dr. Coin wrote a prescription for physical therapy for claimant to start right away. On July 24, 1996, claimant returned for post-operative care including the removal of the splint. Examination of claimant's hand revealed the wound had healed well with soft tissue swelling over the left middle and small fingers and slightly decreased joint space ratio over the proximal interphalangeal joint of the left ring finger. Dr. Coin ordered claimant to continue physical therapy at a decreasing rate and to return for a follow-up visit on September 4, 1996. Claimant failed to show up for the scheduled follow-up visit. (Tr. 126).

On July 19, 1996, Christie Harrington, a physician at HealthSouth Rehabilitation Center of St. Louis, transferred claimant's physical therapy referral by Dr. Coin to Quincy Medical Group. (Tr. 85-88).

In the Initial Evaluation on July 19, 1996, Edith Joly, a physical therapist at Quincy Medical Group, noted how claimant underwent a tenolysis, capsulotomy, and neuroloysis. (Tr. 82). Ms. Joly noted that claimant injured her left ring finger on March 13, 1995, and due to lack of range of motion, claimant sustained a tenolysis, capsulotomy, and neuroloysis on July 17, 1996. (Tr. 83). Claimant reported pain and stiffness to her third and fifth fingers. Examination revealed a decrease in the active range of motion of those fingers. (Tr. 82-83). Ms. Joly recommended weekly physical therapy treatment at Quincy Medical Group and at HealthSouth Rehabilitation to enable claimant to have active assisted range of motion of the third, fourth, and fifth fingers. (Tr. 82, 84). After the treatment on July 23, 1996, Ms. Joly noted that claimant was progressing as expected and recommended that claimant continue physical therapy. (Tr. 80). Claimant reported less pain, but her finger still was sore. (Tr. 80). In the Discharge Summary of August 15, 1996, Ms. Joly noted how claimant had been treated on July 19 and 23, 1996, for tenolysis, capsulotomy, and neuroloysis of the left hand and how claimant had reached 5% of the treatment goals. (Tr. 79, 81). Ms. Joly noted that claimant decided to discontinue treatment so that she could go to therapy closer to her home. (Tr. 79).

On October 30, 1996, claimant returned to Dr. Coin for a follow-up visit. (Tr. 125). Claimant explained that she missed her previously scheduled appointment, because she was now taking full-time care of her mother who has Alzheimer's. Dr. Coin noted that claimant is slowly improving and gave claimant resistive splints for distal joints and released her to regular duties.

Claimant failed to return for her scheduled return visit on January 15, 1997. (Tr. 125).

On March 11, 1997, claimant returned to Dr. Coin and reported occasional stiffness, particularly in the left ring finger, decreased grip, and occasional achiness. (Tr. 125). Physical examination revealed claimant lacks 15-20% flexion at the distal joint of the left ring finger and 10% flexion at the distal joint of the small and ring fingers and normal range of motion at the proximal interphalangeal joint and metacarpophalangeal joint. Dr. Coin released claimant to regular duties. (Tr. 125).

On May 4, 1997, claimant injured her right calf while bowling and received treatment in the emergency room at Blessing Hospital. (Tr. 190). Claimant reported feeling a tearing sensation at the time of injury. Dr. Hayden diagnosed claimant with a muscle tear and instructed claimant not to bear weight on her right leg, to use ice packs, to elevate her leg on pillows, and to take Ibuprofen for pain. (Tr. 190). On May 13, 1997, claimant reported increased right leg discoloration and cold toes since injuring her right leg while bowling one week earlier. (Tr. 184, 187). Claimant felt a tearing sensation posteriorly in her calf at the time of the accident with discoloration posteriorly developing thereafter. Dr. Bitter treated claimant for the discoloration by prescribing Naprosyn for her pain. Dr. Stan Bartley diagnosed claimant with soft tissue trauma to the right lower leg with ecchymoses and probable aberrant arterial circulation with bilateral absent dorsalis pedis pulses. (Tr. 184). Dr. Bartley advised claimant that she should stop smoking, and claimant indicated that she planned to stop smoking. (Tr. 185). On May 27, 1997, claimant sought medical treatment in the emergency room at Blessing Hospital for pain in her right calf muscles. (Tr. 186-88). Claimant reported a bowling accident on May 4, 1997, with treatment in the emergency room on two occasions. (Tr. 187). Upon examination, Dr. Richard

Saalborn noted that claimant's right leg has ecchymosis about the anterior and posterior calf in the distal one half. Dr. Saalborn found that claimant has a probable strain of the right calf muscles and possible tear of gastrocnemius and prescribed Anaprox-DS and Darvocet-N. (Tr. 187). Dr. Bitter admitted claimant for a MRI. (Tr. 187-88).

On August 14, 1998, claimant received treatment for left ankle sprain in the emergency room at Blessing Hospital. (Tr. 182-83). Claimant reported stepping into a hole in the backyard while helping her husband build a fence. (Tr. 182). The x-ray revealed a tiny density adjacent to the left medial malleolus, and Dr. Charles Lemon applied an air cast over an Ace wrap as treatment. Dr. Lemon prescribed Lortab for pain. (Tr. 182).

On November 28, 1998, claimant received treatment for a cough in the emergency room at Blessing Hospital. (Tr. 121-22, 180-81). Claimant reported having the harsh cough for two weeks with more severity at night. (Tr. 122, 180). Dr. Crystal Perry diagnosed claimant with tracheobronchitis and conjunctivitis. Dr. Perry prescribed a Z-pak, Phenergan with Codeine, and Gentamicin. (Tr. 122, 180).

On October 2, 1999, claimant sought medical treatment in the emergency room at Blessing Hospital after striking the toe on her right foot against a chair. (Tr. 117-19, 179). The doctor sutured claimant's lacerated right toe. (Tr. 119). The x-ray revealed no evidence of a fracture or dislocation to the toe. (Tr. 120).

On November 25, 1999, claimant received treatment in the emergency room at Blessing Hospital for acute viral syndrome. (Tr. 114-16, 178). Claimant's symptoms included body aches and fever. (Tr. 114).

On June 22, 2000, claimant received treatment in the emergency room at Blessing

Hospital for acute bronchitis.  (Tr. 110-12, 177).  Claimant's chest x-ray revealed no infiltrates and her heart and pulmonary vascularity within normal limits.  (Tr. 113).

On October 9, 2000, claimant received treatment in the emergency room at Hannibal Regional Hospital for spastic colon.  (Tr. 134-47).  Claimant reported having abdominal pain, nausea, and diarrhea.  (Tr. 135, 137).  The ultrasound of claimant's right upper quadrant revealed a normal gallbladder, no sign of gallstones, and liver, pancreas, and right kidney unremarkable.  (Tr. 152).   Dr. Harmston prescribed Naprosyn, Flexeril, and Vicodin for claimant as treatment.  (Tr. 153).

On November 23, 2000, claimant received treatment in the emergency room at Blessing Hospital for acute sinusitis and post-viral bronchitis.  (Tr. 107-09, 176). On December 13, 2000, claimant was transported by ambulance to the emergency room at Blessing Hospital and reported a possible allergic reaction.  (Tr. 104-05, 175).  The emergency room doctor made a diagnosis of urticaria probably secondary to birth control pills.  (Tr. 106).

On April 20, 2001, claimant sought treatment in the emergency room of Blessing Hospital after falling off a four-tiered stair.  (Tr. 97-98, 172-74).  Claimant reported bilateral foot and ankle pain but being ambulatory with pain since the fall.  (Tr. 98, 172-73).  Claimant reported no chronic medications and not abusing tobacco.  Upon examination, Dr. Stuart Pyatt noted claimant has tenderness at the proximal and lateral right foot dorsally as well as ecchymosis and swelling in the same area.  Dr. Pyatt opined that claimant's x-rays revealed an avulsion of the lateral aspect of the talus on the right side and a sprained left ankle.  (Tr. 98-99).  The x-rays of claimant's left ankle and foot revealed no acute fracture or dislocation.  (Tr. 100, 102).  The x-ray of claimant's right ankle revealed a possible nondisplaced fracture of the distal right fibula.  (Tr. 101).  The x-

ray of claimant's right foot revealed no acute fracture. (Tr. 103).

On July 5, 2001, claimant requested medical assistance to help her to stop smoking and to lose weight. (Tr. 158). Claimant reported gaining over one hundred pounds over the last eleven years with a forty to fifty pound weight gain in the last six months. Claimant reported smoking one to two packs of cigarettes each day. Claimant experiences severe headaches, sinus congestion and pressure, sore throat, and general malaise. At the time of the appointment, Diane Nutter, a registered nurse at Quincy Medical Group, recorded claimant's height to be five-feet zero inches tall and her weight to be 192 pounds. Claimant requested no stimulant medication to assist her in her weight loss effort. Ms. Nutter prescribed Wellbutrin SR to assist in claimant's smoking cessation program and encouraged claimant to exercise on a regular basis and to watch her diet. On August 2, 2001, claimant returned for ongoing weight management follow-up treatment. Ms. Nutter encouraged claimant to continue weight loss regime by exercising and following dietary modifications. (Tr. 158). On August 30, 2001, claimant failed to keep her scheduled appointment. (Tr. 157).

On September 4, 2001, claimant returned for ongoing management of her blood pressure and a recheck of her thyroid. (Tr. 157). Ms. Nutter noted that claimant's hypertension to be stable and continued claimant's Norvasc and K-Tabs prescriptions and increased her Lasix and Synthroid. Claimant returned on September 27, 2001, complaining of a dry, nonproductive cough. Ms. Nutter diagnosed claimant with bronchitis and prescribed Depo Medrol, Avelox, and Serevent inhaler as treatment. Ms. Nutter instructed claimant to consume fluids and to stop smoking. (Tr. 157). On October 30, 2001, Ms. Nutter performed claimant's annual woman examination. (Tr. 156). In the assessment, Ms. Nutter found claimant to have hypothyroid and

menopausal syndrome and refilled her Synthroid prescription. (Tr. 156).

On December 18, 2001, claimant sought treatment in the emergency room of Blessing Hospital for shortness of breath. (Tr. 90-91, 171). Claimant reported having experienced similar symptoms previously and being a smoker. (Tr. 91). The doctor listed as other problems claimant's asthma, obesity, and hypertension. Claimant reported not recently seeing or receiving treatment by a doctor. (Tr. 91). The doctor listed bronchitis as the clinical impression. (Tr. 92). The chest x-ray revealed an essentially negative chest with no interval change from June 22, 2000. (Tr. 94).

In the Progress Note dated February 5, 2002, claimant returned for a blood pressure check. (Tr. 155). Claimant reported the estrogen replacement therapy started on October 30, 2001, helped tremendously. Ms. Nutter noted that claimant's hypertension and menopausal syndrome to be stable. Ms. Nutter continued claimant's Femhrt, Norvasc, and Synthroid prescriptions. On April 2, 2002, claimant failed to keep her scheduled appointment. (Tr. 155).

Claimant received medical treatment at the Montgomery City Medical Clinic from August 12, 2002, through December 19, 2003. (Tr. 216-25). The undersigned notes that the clinic treatment notes are mostly illegible, and some notes are signed by a nurse practitioner, not Dr I. Jeffrey Cramp, a D.O. at the Montgomery City Medical Clinic. On August 12, 2002, claimant reported problems with frequency of urination and her weight. (Tr. 223). Claimant admitted that she eats poorly, does not exercise, and continues to smoke. Claimant indicated that she did not want to have much testing done, because she did not have insurance at that time. (Tr. 223). Dr. Cramp diagnosed claimant with cystitis, hypertension, hypothyroidism, post-menopausal syndrome, obesity, and mild edema and refilled her Norvasc, Lortab, and Femhrt prescriptions.

(Tr. 224).    In a follow-up visit on November 5, 2002, claimant reported that her ankles hurt, and her left shoulder bothered her. (Tr. 222). Dr. Cramp diagnosed claimant with hypertension and degenerative joint disease. (Tr. 222). On February 11, 2003, claimant returned to discuss her social security disability status. (Tr. 221).

On a prescription note dated February 11, 2003, Dr. Cramp expressed his opinion regarding claimant's disability application. (Tr. 165). Dr. Cramp noted "[p]lease consider application for disability due to multiple med problems. Thanks." (Tr. 165).[3]

On February 17, 2003, claimant returned to the clinic for a blood pressure reading. (Tr. 221). On March 7, 2003, claimant reported flu symptoms including a runny nose, coughing, and sneezing. Dr. Cramp diagnosed claimant with bronchitis and sinusitis. (Tr. 221).

On April 10, 2003, Dr. Eddie Runde, an occupational and environmental medicine specialist, examined claimant on referral by the Social Security Administration for a psychiatric examination and report. (Tr. 162-62). Claimant reported seeking SSA disability benefits for high blood pressure, hypothyroidism, surgery on left hand and right elbow, injury to right leg and left ankle, and osteoarthritis. (Tr. 162). Claimant reported daily pain in her left ankle with her pain being alleviated by Darvocet and Loratab. Claimant reported remaining active with household chores including vacuuming and cleaning the house, taking walks, watching television, and reading. Claimant reported smoking a half a pack of cigarettes every day. (Tr. 162). Dr. Runde noted that claimant was able to dress and undress without assistance, and she was able to get onto and off the examining table without assistance. Dr. Runde noted that claimant had a full range of

_____

[3]"A medical source opinion that an applicant is 'disabled' or 'unable to work' ... involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005), citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

motion of her cervical spine as well as her elbows and wrists bilaterally. An examination of claimant's lumbar spine was grossly normal. Dr. Runde noted that the strength in claimant's lower extremities was normal as evidenced by having claimant walk on her toes, walk on her heels, and squat. Dr. Runde opined that claimant's subjective complaints are greater than his objective findings based on his examination of claimant. (Tr. 163). With respect to claimant's work status, Dr. Runde noted "[o]bjectively, this examinee is capable of performing fine movements with her fingers." (Tr. 163). Dr. Runde found claimant has no difficulty with sitting, hearing, speaking, or traveling. (Tr. 164). Dr. Runde determined that claimant can stand and/or walk at least two hours in a normal eight-hour day with breaks, and can lift and carry up to thirty pounds with the only limitation being subjective pain complaints. Dr. Runde concluded that claimant has no problems with handling objects. Dr. Runde opined that claimant should be able to sustain a forty-hour work week on a continuous basis. (Tr. 164).

On April 23, 2003, claimant returned to the Montgomery City Medical Clinic and reported having pink eye, a sore throat, blocked sinuses, and increased indigestion. (Tr. 220). Claimant admitted that the foods she eats late at night are the cause of her indigestion. Dr. Cramp diagnosed claimant with otitis media, left conjunctivitis, arthritis, uncontrolled hypertension, and obesity. Dr. Cramp ordered claimant to continue her medication regime and prescribed Keflex and suggested a change in diet. Claimant returned on April 28 and reported feeling worse, and both eyes being infected. (Tr. 219). On May 27, 2003, claimant reported continued sore throat, earache, and cough and admitted to still smoking. Dr. Cramp advised claimant to stop smoking and diagnosed claimant with bronchitis and sinusitis. (Tr. 218). Dr. Cramp prescribed Avelox as treatment. (Tr. 218). On June 5, 2003, claimant returned for a follow-up visit and reported that

she stopped taking her cough medicine even though a cough persisted. (Tr. 217). Claimant admitted to feeling awful and to still smoking. Dr. Cramp diagnosed claimant with possible asthma, hypertension, obesity, and allergic rhinitis and prescribed Singular, Prevacid, and Nasonex. Claimant returned on June 19, 2003, for follow-up treatment. (Tr. 217). On July 17, 2003, claimant failed to keep her scheduled appointment at the clinic. (Tr. 216). On July 30, 2003, claimant reported dizziness, fatigue, and sinus congestion. On August 12, 2003, a nurse at the clinic gave claimant samples of Diovan. (Tr. 216). Claimant returned to the clinic on October 28, 2003, and reported arthritic pain in her hips and legs. (Tr. 225). On December 19, 2003, Dr. Cramp's diagnosis included degenerative joint disease. Dr. Cramp encouraged claimant to lose weight. (Tr. 225).

On March 2, 2004, Dr. Cramp completed a Medical Source Statement - Physical on behalf of claimant. (Tr. 226-28). Dr. Cramp noted that claimant can occasionally lift and/or carry ten pounds, stand and/or walk a total of two hours, and sit a total of two hours. (Tr. 226). Dr. Cramp determined claimant to be limited in her ability to push and/or pull finding that she "cannot push or pull against resistence with either upper or..." (Tr. 226).[4] Dr. Cramp found that claimant can never climb, stoop, kneel, crouch, or bend and can occasionally balance. (Tr. 227). Dr. Cramp found that claimant is unlimited in fingering, feeling, seeing, hearing, and speaking, and limited in reaching and handling inasmuch as those activities may exacerbate her arthritis symptoms. (Tr. 227). Dr. Cramp opined "Mrs. Zeh has osteoarthritis involving her lumbar spine; bilateral hips, knees, ankles, and feet. She has marked degeneration of her above joints. Her pain is constant and helped with meds." (Tr. 228). When finding rest helpful in controlling claimant's

---

[4]The undersigned notes that he cannot read the last four words in the sentence because the copy contained in the record includes on the top part of the words. (Tr. 226).

existing pain, Dr. Cramp opined that claimant should assume a reclining and a supine position for up to thirty minutes, one to three times a day and prop up her legs to a height of two to three feet, one to three times a day while sitting. (Tr. 228).

## IV.    The ALJ's Decision

The ALJ found that claimant met the nondisability requirements for a period of disability on September 30, 2003, and is insured for benefits through that date. (Tr. 18). The ALJ found that claimant has not engaged in substantial gainful activity since the alleged onset date of disability. The ALJ found that the medical evidence establishes that claimant has severe impairments of osteoarthritis of the ankles, legs, and lumbar spine, hypertension, and hypothyroidism. The ALJ found that claimant's medically determinable impairments do not meet or equal one of the listed impairments set forth Appendix 1, Subpart P, Regulations No. 4. The ALJ found that claimant is not fully credible, and her allegations of limitations precluding all work are not credible. (Tr. 18). The ALJ further found that claimant has the residual functional capacity to perform an essentially full range of sedentary work not requiring forceful pulling and pushing with the lower and upper extremities. (Tr. 19). The ALJ determined that claimant has transferable skills from skilled work previously performed. The ALJ specifically found that claimant can lift and carry twenty pounds occasionally and ten pounds frequently, to sit for up to six hours in an eight-hour workday, and to stand and walk (combined) for a maximum of two hours in an eight-hour workday. The ALJ opined that claimant is unable to perform any of her past relevant work, but that claimant has the residual functional capacity to perform a significant range of sedentary work. The ALJ noted that claimant is an individual closely approaching advanced age with "more than a high school (or high school equivalent) education." (Tr. 19).

- 24 -

Considering claimant's transferable skills, age, education, and residual functional capacity, the ALJ opined based on the vocational expert testimony that claimant can perform a significant number of jobs in the national economy, such as admissions clerk. (Tr. 19). The ALJ thus concluded that claimant was not under a disability at any time through the date of his decision. (Tr. 19).

**V.      Discussion**

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); <u>see also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's]

physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to

support his findings, regardless of whether substantial evidence exists to support a different conclusion.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.	The credibility findings made by the ALJ.

2.	The claimant's vocational factors.

3.	The medical evidence from treating and consulting physicians.

4.	The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.	Any corroboration by third parties of the claimant's impairments.

6.	The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ improperly discredited and failed to give controlling weight to her treating physician's opinions when determining her residual functional capacity.[5]

---

[5]Claimant's contention that the ALJ failed to make a finding regarding whether her left hand injury was a severe impairment is without merit.  The record shows that claimant injured her left hand on March 13, 1995, and Dr. Coin treated claimant for this injury and released her to regular duties on October 30, 1996, as well as in a follow-up visit on March 11, 1997.  (Tr. 125-32).  Claimant engaged in substantial gainful activity thereafter and stopped working due to the pain in her legs, not because of her left hand injury.  (Tr. 235-36).  Inasmuch as claimant worked with her left hand injury over a period of years, the injury cannot be considered disabling. The record is devoid of any evidence showing that claimant's condition had deteriorated or precluded her from working in the past.  See Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) (claimant not considered disabled when claimant worked with an impairment over a period of years absent

A.              <u>Weight Given to Dr. Cramp's Opinions</u>

Claimant contends that the ALJ erred by not giving appropriate weight to Dr. Cramp's

opinions when determining her residual functional capacity.  <u>See</u> 20 C.F.R. § 404.1527(d)(2)

(2005) (requiring the Commissioner to give controlling weight to the opinion of a treating

physician if "it is well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence"); <u>Shontos v. Barnhart</u>, 328

F.3d 418, 426 (8th Cir. 2003).  When a treating source's opinion is not controlling, it is weighed

by the same factors as any other medical opinion: the examining relationship, the treatment

relationship, supporting explanations, consistency, specialization, and other factors.  <u>See</u> 20

C.F.R. § 404.527(d).  Claimant contends that the ALJ should have accorded more weight to Dr.

Cramp's opinions inasmuch as the examining physician "took no x-rays and saw the Plaintiff only

briefly."  (Pltf.'s Brief in Support of Compl., at p. 21).

In the instant cause from August 12, 2002, through December 19, 2003, Dr.

Cramp, or a nurse practitioner in the office, treated claimant's cystitis, hypertension,

hypothyroidism, post-menopausal syndrome,  obesity, mild edema, bronchitis and sinusitis.  A

review of her treatment notes reveals that Dr. Cramp never found claimant to have any severe

functional limitations with respect to sitting until completing the Medical Source Statement -

Physical on behalf of claimant on March 2, 2004.  In his decision, the ALJ extensively discussed

Dr. Cramp's opinions set forth in the Medical Source Statement - Physical and noted that:

> Further, except for the essentially unsubstantiated functional assessment submitted
> by Dr. Cramp, the remaining medical sources do not substantiate the level of
> symptomatology or the level of functional restriction described by claimant.  In this
> regard, I can accord the report of Dr. Cramp only limited probative weight.  He

significant deterioration).

- 28 -

states that the claimant can only sit for up to two hours in an 8-hour workday. There is no basis in the medical record or in the reports of other physicians that would establish a credible limitation relative to the claimant's ability to sit. There is no impairment of record which would cause significant restrictions in the claimant's ability to sit.... As with Dr. Cramp's restrictions on the claimant's ability to sit, no other physician of record has reached such a conclusion. Giving the claimant the benefit of the doubt, the RFC herein precludes her from *forceful* pulling and pushing with either the upper or lower extremities secondary to her history of hand and elbow surgery as well as injuries to the ankles and feet.

(Tr. 15)(internal citations omitted).

Dr. Cramp's opinions were based primarily on claimant's subjective complaints and were not supported by clinical and diagnostic techniques or objective medical evidence. Such findings were inconsistent with other evidence in the record. Cf. Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001)(treating physician's vague and conclusory opinion is not entitled to deference); see Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000) (ALJ's decision to discount or even disregard the opinion of a treating physician will be upheld "where other medical assessments are supported by better or more thorough medical evidence or where a treating physician renders inconsistent opinions that undermined the credibility of such opinions")(citations and internal quotation marks omitted). Indeed, the records from claimant's treating physician, Dr. Cramp, do not contain clinical evidence of a disabling condition during the relevant time period or any restrictions imposed by Dr. Cramp based on claimant's alleged functional limitations. As noted by the ALJ, the objective medical evidence revealed no significant or advanced orthopedic pathology. Likewise, Dr. Cramp's conservative treatment of claimant and the lack of functional limitations previously imposed by him undermine the credibility of the opinions set forth in the Medical Source Statement - Physical. A review of the record shows no substantive evidence to support Dr. Cramp's opinions. Thus, the ALJ's determination not to rely on Dr. Cramp's

opinions as to claimant's functional limitations was not improper. The substantial evidence on the whole record supports the ALJ's conclusion that Dr. Cramp's opinions were not entitled to controlling weight.

Opinions from consulting physicians may constitute substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971); see Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000)(opinion of consulting physician who examines claimant once generally does not constitute substantial evidence). This is especially so when the consulting physicians' opinions are compatible with other medical evidence in the record. Ward v. Heckler, 786 F.2d 844, 847 (8th Cir. 1986). The ALJ found that Dr. Runde, a specialist in an occupational and environmental medicine, based his findings on his physical examination of claimant. Greater weight is generally given to the opinion of a specialist about medical issues in the area of speciality, than to the opinion of a non-specialist. See 20 C.F.R. §§ 404.1527(d)(5); 416.927(d)(5). After examining claimant, Dr. Runde opined that claimant could perform work-related functions such as standing and/or walking at least two hours in a normal eight-hour day with breaks, lifting and carrying up to thirty pounds with the only limitation being subjective pain complaints. Dr. Runde further opined that claimant should be able to sustain a forty-hour work week on a continuous basis.

In addition, the undersigned notes that the ALJ did not rely solely on the opinions of the consulting physician in making his determination. Rather, a review of the decision shows the ALJ to have examined the medical evidence contained in the record as a whole and to have made his determination thereon. See Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995). In relevant part, the ALJ opined that "the functional restrictions set forth by Dr. Runde far more accurately portray the general consensus of the medical record relative to the claimant's ability to function

on a sustained basis." (Tr. 16). Consistent medical evidence shows claimant experienced no functional limitations. Dr. Cramp's treatment consisted of conservative treatment during the relevant period and never imposed any functional limitations until completing the Medical Source Statement - Physical, three months after claimant's last office visit, or found claimant's functional limitations precluded gainful employment. Finally, the undersigned notes that where there are conflicts in the evidence, the resolution of such conflicts is for the Commissioner, and not the Court, to make. Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000); Beasley v. Califano, 608 F.2d 1162, 1166 (8th Cir. 1979). This is so even when the medical evidence is in conflict. Cantrell, 231 F.3d at 1107; Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)("Where the medical evidence is equally balanced, ... the ALJ resolves the conflict."). "It is the ALJ's function to resolve conflicts among the various treating and examining physicians." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted).

In the instant case, the ALJ determined to give Dr. Cramp's opinions neither controlling weight nor much deference. The ALJ gave good reasons for such determinations, and such reasons are supported by substantial evidence on the record as a whole. Dr. Cramp's opinions were based primarily on claimant's subjective complaints and were not supported by clinical and diagnostic techniques or objective medical evidence. Where a physician's conclusion appears to rest on a claimant's subjective complaints, the ALJ is permitted to discredit such conclusion. Brown v. Chater, 87 F.3d 963, 964-65 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993)). As such, a physician's conclusion may be accorded little weight where it is based heavily on a claimant's subjective complaints and is at odds with the weight of objective evidence. See Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999). Moreover, the opinions

contained in the Medical Source Statement - Physical, finding claimant has extremely severe functional limitations are inconsistent with and not supported by Dr. Cramp's own treatment notes.  The opinions set forth in the Medical Source Statement - Physical are conclusory, not based upon any clinical or laboratory diagnostic techniques, and are not supported by the evidence contained in the record as a whole.  See Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995) (physician's conclusory statement without supporting evidence does not amount to substantial evidence of disability); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986) (per curiam) (physician's opinion must be supported by medically acceptable clinical or diagnostic data).   Thus, the ALJ did not err in according Dr. Cramp's opinions little weight.  Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).

The substantial evidence on the record as a whole supports the ALJ's decision.  Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome.  Woolf, 3 F.3d at 1213 (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

Finally, the undersigned notes that where there are conflicts in the evidence, the resolution of such conflicts is for the Commissioner, and not the Court, to make.  Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000).  This is even so when the medical evidence is in conflict.  Id.  In the instant cause, the ALJ gave good reasons to discount the functional limitations rendered by Dr. Cramp inasmuch as his opinions were not supported by substantial medical evidence on the record as a whole.  Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome.  Woolf, 3 F.3d at 1213 (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). Accordingly, the decision of the ALJ denying claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed and that claimant's complaint be dismissed with prejudice.

The parties are advised that they have eleven days in which to file written objections to this Report and Recommendation. Failure to timely file objections may result in waiver of the right to appeal the questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this  5th  day of August, 2005.

                    /s/ Terry I. Adelman
                    UNITED STATES MAGISTRATE JUDGE